## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| MANHATTAN ASSOCIATES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| vs. | ) | FILE NO._____ |
| | ) | |
| PROJECT VERTE, INC. | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Manhattan Associates, Inc. ("Manhattan") hereby files its

Complaint against Defendant Project Verte, Inc. ("Project Verte"), showing this

Court as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff Manhattan is a corporation created under the laws of the State

of Georgia and having its principal place of business and nexus of corporate

decision making located at 2300 Windy Ridge Parkway, 10th Floor, Atlanta,

Georgia 30339.

2.    Project Verte is a corporation created under the laws of the State of

Delaware, having its principal place of business and nexus of corporate decision

making located at 641 Lexington Avenue, 24th Floor, c/o Continental Ventures, New York, NY, 10022.

3.     Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction over this case because the Court has original jurisdiction over Manhattan's claims under the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836. Pursuant to 27 U.S.C. § 1367(a), the Court has supplemental jurisdiction over Manhattan's additional state law claims because those claims are so related to Manhattan's DTSA claim that they form part of the same case or controversy.

4.     This court has personal jurisdiction over Project Verte because Project Verte has specifically and expressly consented to personal jurisdiction and venue in this Court in Paragraph 21.4 of the SaaS Services Agreement, which provides, in relevant part, that "[a]ny action . . . arising out of th[e] Agreement . . . will be brought in the Federal District Court for the Northern District of Georgia. . . . [and] each Party expressly agrees that th[is] court[] will have personal jurisdiction with respect to that Party[.]"  Additionally, Project Verte conducts business in Georgia and maintains an active registration with the Georgia Secretary of State, Corporations Division.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claim

occurred in the Northern District of Georgia.  Pursuant to L.R. 3.1(B)(3), venue is

proper in the Atlanta Division of this District because the cause of action arose

within the Atlanta Division.

6.     Project Verte may be served through its registered agent in the state of

Georgia, which is National Registered Agents, Inc., 1201 Peachtree Street, N.E.,

Suite 1240, Atlanta, GA, 30361.

## FACTUAL BACKGROUND

7.     Manhattan develops, licenses, hosts, implements, and maintains its own

proprietary supply chain commerce computer software products.

8.     Project Verte provides ecommerce fulfillment services to retailers.

## THE SAAS SERVICES AGREEMENT

9.     On or about May 1, 2018, Manhattan and Project Verte entered into a

SaaS Services Agreement (the "Contract"), which was signed on Manhattan's

behalf by Dennis Story, Executive Vice President and Chief Financial Officer, and

on Project Verte's behalf, by Kannan Rajappa, Executive Vice President.  A true

and correct copy of the Contract redacted to remove confidential and proprietary

pricing and trade secret information is attached hereto as Exhibit A and is

incorporated by reference herein.

10.   Under the Contract, Manhattan licensed to Project Verte for a term of thirty-six months Manhattan's subscription-based Software as a Service ("SaaS"), which provided access to, for Project Verte's use in its ecommerce fulfillment operations, those Manhattan products described in Exhibit 1 to Schedule A of the Contract (the "Licensed Products").

11.   Under the terms of the Contract, Manhattan agreed to host the Licensed Products in a third-party data center.  The Contract also contains the terms under which Manhattan would provide to Project Verte implementation, training, support, and other professional services (the "Professional Services").

12.   The Contract's thirty-six month initial term commenced on or about May 1, 2018.  Schedule A of the Contract expressly defines the initial term as follows, "1.5 **Initial Term**.  The thirty-six (36) month subscription period commencing on the Commencement Date [*i.e.*, the effective date of the Agreement]."

13.    Under the terms of the Contract, the Initial Term would expire on or about May 1, 2021.

14.   The Contract contemplates that the parties would share Confidential Information and includes as Section 5 mutual non-disclosure obligations.

15.   The Contract defines Confidential Information as

4

> Any and all nonpublic technical and non-technical data
> or information, in oral, written, graphic or electronic
> form, that is either indicated to be the proprietary or
> confidential information of a Party, or which, by its
> nature, the other Party would reasonably deem to be
> confidential or proprietary, including (i) a Party's
> research, development, business activities, trade secrets,
> workflows, source code, object code, ideas, know-how,
> inventions, processes, testing methods, specifications,
> designs, schematics, drawings, techniques, technical
> documentation, images, icons, audio-visual components
> and objects, marketing or business plans, and financial
> information, (ii) any of the information described in item
> (i) above pertaining to a third party but in the possession
> or control of a Party, and (iii) except as otherwise
> provided in this Agreement, the terms of this Agreement.
> Confidential Information does not include Customer
> Personal Data.

Contract § 1.7.

16.  Section 16.1 of the Contract provides that "[t]his Agreement will remain in effect until a Party terminates it in accordance with the remaining provisions of this Section 16."

17.  Section 16.2 of the Contract states that "[e]ither Party may terminate this Agreement . . . upon written notice to the other if the other has failed to cure a material breach . . . within thirty (30) days following receipt of such written notice from the terminating Party specifying the nature of the breach[.]"

18.  The Contract obligates Project Verte to pay an annual subscription fee for the Licensed Products in advance of each year of the term, in the agreed-to

amounts set forth in the Contract, and fees for the Professional Services on a time and materials basis at rates agreed to in the Contract.

19.   Schedule A of the Contract sets forth Manhattan's invoicing terms and Project Verte's payment obligations: "5. **Invoicing and Payment**.  In general, Manhattan will invoice [Project Verte] for the Annual Subscription Fee in advance of the applicable Annual Period, and will invoice any other amounts owing in accordance with its regular invoicing practices.  Payment will be due within thirty (30) days following the date of invoice."  Manhattan's regular invoicing practices are to invoice for Professional Services semimonthly.

### THE PARTIES PERFORM UNDER THE CONTRACT

20.   On or about May 2, 2018, Manhattan invoiced Project Verte the subscription fee of $354,400 for the first year of the Initial Term and Project Verte paid same.

21.   Manhattan has fulfilled all of its obligations under the Contract, including timely providing access to the Licensed Products, and otherwise fulfilling its contractual obligations, including providing Professional Services. True and correct copies of the access delivery receipts for the Licensed Products contemplated by the Contract are attached hereto in composite form as Exhibit B and are incorporated by reference herein.

22.  Beginning on May 24, 2018, and continuing through late January 2019,
Manhattan provided to Project Verte, and Project Verte paid for, Professional
Services associated with the system design and implementation of the Licensed
Products totaling approximately $170,147.45.  Those Professional Services
included delivery of detailed and Project Verte specific solution design and
functional documents.

23.  On or about February 15, 2019, Manhattan invoiced Project Verte
$3,376.00 for Professional Services described in invoice #408821 as, "Services for
Track 1 – Implementation Support," with a Due Date of March 17, 2019.  A true
and correct copy of Manhattan's February 15, 2019, invoice to Project Verte is
attached hereto as Exhibit C and is incorporated by reference herein.

24.  In connection with providing Professional Services, Manhattan
provided Project Verte with Manhattan's confidential and trade secret information
subject to the Contract's Mutual Nondisclosure and Duty to Safeguard the
Licensed Products provisions.

25.  Manhattan and Project Verte engaged in a series of communications,
including planning, scoping, and design meetings and related emails, wherein
Manhattan provided recommendations to Project Verte about order management,
logistics design, and supply chain software configuration in which Manhattan

disclosed its proprietary knowledge and trade secrets about order management systems and logistics, supply chain software, and Manhattan's best practices for both.

26.   In connection with providing Professional Services, Manhattan disclosed confidential and trade secret information to Project Verte including, among other things, database information, project planning documentation, detailed design information related to Inventory, Component, Organizations, Locations, Profiles, Security Design, Order Promising, Release and Post-Release Updates, and Transportation Design, and Manhattan's know-how about order management systems and logistics, and supply chain software.

27.   Section 5.1 of the Contract (Mutual Nondisclosure) provides that "with respect to the other Party's Confidential Information, each party will:"

> (a) protect the confidentiality of that Confidential Information with a reasonable level of care and at a level no less than the level of care that Party uses to protect its own Confidential Information,
>
> (b) not, without the prior written consent of the other Party, use the other Party's Confidential Information, or permit it to be accessed or used, for any purpose other than as reasonably necessary to exercise that Party's rights or perform its obligations under this Agreement,
>
> (c) not, without the prior written consent of the other Party, disclose that Confidential Information to any

third party, except to that Party's employees or agents who (i) reasonably need to know that Confidential Information to assist that Party, or act on its behalf, in exercising that Party's rights or performing its obligations under this Agreement, (ii) are informed of the confidential nature of that Confidential Information, and (iii) are subject to nondisclosure obligations and limitations on use with respect to that Confidential Information no less restrictive than the provisions of this Subsection 5.1, and

(d) be responsible for the acts or omissions of its employees or agents in violation of their nondisclosure obligations and the limitations on use with respect to that Confidential Information.

28.   Section 7.2 of the Contract (Duty to Safeguard the Licensed Products) requires that "Customer will use its reasonable efforts to safeguard the Licensed Products (including all copies of and all Extensions to the Software) from infringement, misappropriation, theft, or unauthorized access by Customer Personnel or any third party."

## MANHATTAN TAKES REASONABLE STEPS TO SAFEGUARD ITS CONFIDENTIAL AND TRADE SECRET INFORMATION

29.   Manhattan's confidential and trade secret information is subject to efforts by Manhattan that are reasonable under the circumstances to maintain the secrecy of the information, including requiring employees to take steps to ensure that Manhattan's confidential information is not made available outside the company, restricting access to its computer systems and its SaaS software to

9

authorized employees or customers, limiting access to sensitive documents, immediately seizing and securing an employee's company-issued electronic devices to prevent his or her continued access to Manhattan's computer systems upon separation, and disabling access of customers to the Licensed Products upon termination or expiration of a license.

## PROJECT VERTE INTENDS TO BUILD AN IN-HOUSE SYSTEM TO REPLACE THE LICENSED PRODUCTS

30.   On or about March 25, 2019, Mark Gagne, Project Verte's Chief Operations Officer, communicated via a telephone conversation with Jason Benner, Manhattan's Sales Director, that Project Verte wished to cancel its SaaS subscription to the Licensed Products, as Project Verte's Chief Technology Officer had decided to build an in-house order management system rather than use the Manhattan Licensed Products.

31.   In a subsequent call on March 25, 2019, Mr. Gagne told Mr. Benner that Project Verte had no plan to spend any more money with Manhattan as they were not using the Licensed Products.  Manhattan's sales representatives began discussions with Project Verte to better understand this communication.

## MANHATTAN ATTEMPTS TO
## COLLECT PAYMENT UNDER THE CONTRACT

32.   On or about April 19, 2019, Manhattan invoiced Project Verte the

subscription fee of $359,893.20 for the second year of the Initial Term, with a Due

Date of May 1, 2019.  A true and correct copy of Manhattan's April 19, 2019,

invoice to Project Verte is attached hereto as Exhibit D, redacted to remove

confidential and proprietary pricing, banking account information, and trade secret

information and is incorporated by reference herein.

33.   Project Verte failed timely to pay Invoice No. 408821 in the amount of

$3,376.00 (for Professional Services) and Invoice No. 415179 in the amount of

$359,893.20 (for the year two subscription fee) due to Manhattan, and those

amounts remain unpaid.

34.   On July 1, 2019, Bruce Richards, Manhattan's Chief Legal Officer,

made written demand on Project Verte for the amounts then past due as follows (i)

Annual Subscription Fee of $359,893.20 for the second year of the term, and (ii)

Professional Services Fees in the amount of $3,376.00.  Mr. Richards also

confirmed that Manhattan remained ready, willing, and able to perform its

remaining obligations under the Contract.  A true and complete copy of Mr.

Richards' July 1, 2019, letter is attached hereto as Exhibit E and is incorporated by

reference herein.

## PROJECT VERTE DEVELOPS AN IN-HOUSE
## SYSTEM TO REPLACE MANHATTAN'S LICENSED PRODUCTS

35.  On October 28, 2019, Jossef Ck, a major investor in Project Verte, emailed Mr. Richards restating that Project Verte no longer wished to use Manhattan's SaaS software.

36.  In the same October 28, 2019, email, Jossef Ck disclosed Project Verte had in fact developed its own in-house order management software solution, apparently in line with Mr. Gagne's March 2019 statement of intent.

37.  On information and belief, Project Verte relied upon and utilized confidential and trade secret information obtained from Manhattan during the performance of the Contract, including, but not limited to, Manhattan's project planning, design, and database information and Manhattan's know-how about order management systems, logistics and supply chain software, in building its own in-house order management software solution.

38.  Section 2.3(c) (Use Restrictions) of the Contract expressly prohibits Project Verte from "modif[ing], copy[ing], adapt[ing], or otherwise creat[ing] derivative works of or improvements to the Licensed Products or the Services, whether or not patentable, without Manhattan's prior written consent."

39.  Section 2.3(e) (Use Restrictions) of the Contract expressly prohibits Project Verte from "access[ing] or utiliz[ing] the Licensed Products or the Services

12

for the purpose of building a competitive product or service to, or using similar ideas, features, functions, or graphics as, the Licensed Products or the Services."

40.  Section 2.3(m) (Use Restrictions) of the Contract expressly prohibits "use [of] any Licensed Product or the Services in violation of any License Limitation or Special Condition."

## PROJECT VERTE FAILS TO PAY INVOICES TRIGGERING THE CONTRACT'S LATE PAYMENT PROVISION

41.  On December 13, 2019, Project Verte took the position that the balance due under the Contract had been paid in full, and that it would like to come to an agreement without paying any more to Manhattan.

42.  Project Verte failed to make payments required by the Contract when due.

43.  Section 4.2 (Late Payment) of the Contract provides for accrual of interest on late payments.  "If any amounts owed by [Project Verte] in accordance with this Agreement remain unpaid for thirty (30) days following the due date, those amounts will bear interest from the due date at the lesser rate of (i) one and one-half percent (1.5%) per month, or (ii) the maximum rate permitted by law."

44.  As of February 1, 2019, the liquidated amounts owing by Project Verte pursuant to the Contract are as follows: (i) for Professional Services Fees from Invoice #408821, $3,376.00 plus accrued interest at 1.5% per month for the period

from March 17, 2019, through and including March 17, 2020, in the amount of

$607.68, with monthly interest of $50.64 accruing on the 17th day of each month

until paid, and with post-judgment interest to run in accordance with applicable

law, and (ii) for the second annual subscription period, Annual Subscription Fees

in the amount of $359,893.20, plus accrued interest at 1.5% per month for the

period from June 1, 2019, through and including April 1, 2020, in the amount of

$53,983.98, with monthly interest of $5,398.40 accruing on the first day of each

month until paid ($3,376 X 0.015 = $50.64; and $359.893.20 x 0.015 = $5,398.40

in monthly interest accrual, respectively).

## PROJECT VERTE TERMINATES THE CONTRACT TRIGGERING THE EARLY TERMINATION PROVISION

45.   Defendant Project Verte has stated consistently since March 25, 2019,

that it wished to terminate the Contract, no longer needs the software, and will not

pay anything more to Manhattan.  Project Verte therefore does not intend to

comply with the Contract.

46.   On or about March 25, 2019, Project Verte, through its conduct,

terminated the Contract prior to the natural expiration of the thirty-six month initial

term.

47.   Schedule A, Paragraph 11.1 of the Contract provides the following

regarding early termination:

14

> Upon termination of this [Contract] or Customer's subscription to the SaaS Services under this Schedule prior to the natural expiration of the Term, any unpaid Annual Subscription Fees, including those that would have become due through the final year of the then-current Subscription Term, will become immediately due and payable, and Customer will pay those Fees to Manhattan within thirty (30) days following the effective date of termination.

48.   As of April 25, 2019, thirty days after Project Verte's first statement of Contract termination, and pursuant to Section 11.1 of Schedule A, Project Verte owes Manhattan for the third annual subscription period as follows:  $359,893.20, plus accrued interest at 1.5% per month for the period from April 25, 2019, through and including March 25, 2020, in the amount of $64,780.80, with monthly interest of $5,398.40 accruing on the 25th day of each month until paid.

49.   Project Verte breached, repudiated, and later terminated the Contract before its natural expiration, and to date has failed to cure its breach of the Contract.  Therefore, Project Verte is liable for all amounts due thereunder.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT AND CONTRACT REPUDIATION

50.   Plaintiff incorporates by reference the averments in paragraphs 1 through 49 as if fully stated herein.

51.   Project Verte has breached its contractual obligations to Plaintiff Manhattan by, among other things, failing to pay amounts due under the contract, using Manhattan's confidential information for purposes unrelated to the performance of its obligations under the Contract, and failing to safeguard the Licensed Products.

52.   Plaintiff Manhattan has been damaged by Defendant Project Verte's breach in the following liquidated amounts (i) Professional Services Fees from Invoice 408821 for $3,376.00 plus accrued interest at 1.5% per month for the period from March 17, 2019 through and including March 17, 2020, in the amount of $607.68, with monthly interest of $50.64 accruing on the 17th day of each month until paid, and with post-judgment interest to run in accordance with applicable law, and (ii) Annual Subscription Fees for the second annual period in the amount of $359.893.20 (with tax), plus accrued interest at 1.5% per month for the period from June 1, 2019, through and including April 1, 2020, in the amount of $53,983.98, with monthly interest of $5,398.40 accruing on the first day of each month until paid, and with post-judgment interest to run in accordance with applicable law.

53.   Defendant Project Verte has unequivocally repudiated its obligations under the Contract, has developed its own order management software solution, and terminated the Contract on March 25, 2019.

54.   Plaintiff Manhattan has been damaged by Defendant Project Verte's contract repudiation in the following liquidated amounts: Annual Subscription Fees for the third annual period in the amount of $353,893.20 (with tax), plus accrued interest at 1.5% per month for the period from April 25, 2019, through and including March 25, 2020, in the amount of $64,780.80, with monthly interest of $5,398.40 accruing on the 25th day of each month until paid, and with post-judgment interest to run in accordance with applicable law.

55.   As a result of Project Verte's default, breach, and repudiation, Manhattan is entitled to the entry of judgment against Project Verte in the above-referenced amounts, plus all costs of this action.

## COUNT II
## DEFEND TRADE SECRETS ACT OF 2016, 18 U.S.C. § 1836

56.   Plaintiff incorporates by reference the averments in paragraphs 1 through 49 as if fully stated herein.

57.   Manhattan develops, licenses, hosts, implements, and maintains its own proprietary supply chain commerce computer software products.

58.     In the course of its business operations, Manhattan has developed trade secrets that are both confidential and valuable in relation to its products.

59.     Manhattan's trade secret information includes technical and nontechnical data, formulae, methods, techniques, know-how, and processes related to its research, design, and development of proprietary branded supply chain commerce computer software products.

60.     Manhattan's trade secret information is not commonly known by or available to the public and is not readily ascertainable by proper means.

61.     Manhattan derives actual or potential economic value from its trade secrets not being generally known to others who might derive economic value from its use.

62.     Keeping its trade secrets confidential gives Manhattan a competitive edge in its industry and market.

63.     Manhattan takes reasonable steps to ensure that Manhattan's confidential and trade secret information is not made available outside the company (or its licensed customers) by restricting access to its computer systems and its SaaS software to authorized employees or customers, limiting access to sensitive documents, immediately seizing and securing an employee's company-issued electronic devices to prevent his or her continued access to Manhattan's

18

computer systems upon separation, and disabling access of customers to the Licensed Products upon termination or expiration of a license.

64.  Project Verte misappropriated Manhattan's protected trade secrets and confidential information by continuing to use Manhattan's protected trade secrets and confidential information after Project Verte breached and repudiated the Contract.

65.  Project Verte's use of Manhattan's trade secrets is causing, and will continue to cause, Manhattan substantial and irreparable injury.

66.  Manhattan seeks compensatory damages against Project Verte in an amount to be proven at trial.

**COUNT III – MISAPPROPRIATION OF TRADE SECRETS UNDER THE GEORGIA TRADE SECRETS ACT, O.C.G.A. § 10-1-76, *et seq*.**

67.  Manhattan repeats and incorporates the allegations of Paragraphs 1 through 49 above as if fully set forth herein.

68.  The Georgia Trade Secrets Act, O.C.G.A. § 10-1-76, *et seq*., prohibits "[d]isclosure or use of a trade secret of another without express or implied consent by a person who . . . [u]sed improper means to acquire knowledge of a trade secret; [or] [a]t the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was:

(I)     Derived from or through a person who had utilized improper means to acquire it;

(II)    Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(III)   Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use . . . .

O.C.G.A. § 10-1-76(2).

69.   "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use, or espionage through electronic or other means." *Id.* § 10-1-76(1).

70.   Project Verte misappropriated Manhattan's protected trade secrets and confidential information by continuing to use Manhattan's protected trade secrets and confidential information after Project Verte breached, repudiated, and terminated the Contract.

71.   Manhattan's trade secrets are also subject to efforts by Manhattan that are reasonable under the circumstances to maintain the secrecy of the information, including, among other things, requiring individuals with access to this information to sign confidentiality agreements and disabling access of customers to the Licensed Products upon termination or expiration of a license.

72.   The confidential information and trade secrets that Project Verte retained derive independent economic value, actual or potential, from not being generally known to the public or to other persons and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

73.   Project Verte's use of Manhattan's trade secrets is causing, and will continue to cause, Manhattan substantial and irreparable injury.

74.   Manhattan seeks compensatory damages against Project Verte in an amount to be proven at trial.  Manhattan further seeks an award of attorneys' fees under O.C.G.A. § 10-1-764, as well as exemplary damages based on Project Verte's willful and malicious misappropriation, pursuant to O.C.G.A. § 10-1-763.

## COUNT IV
## ATTORNEYS' FEES AND EXPENSES PER O.C.G.A.  § 13-6-11

75.   Plaintiff incorporates by reference the averments in paragraphs 1 through 49 above as if fully stated herein.

76.   By unilaterally terminating the Contract, repeatedly repudiating the Contract, developing an in-house order management solution in contravention to the prohibitions of the Contract, and refusing to engage in good-faith discussions to resolve the dispute, Defendant has acted in bad faith, caused Plaintiff Manhattan unnecessary trouble and expense, and been stubbornly litigious, entitling Plaintiff

Manhattan to recover its reasonable attorneys' fees and expenses of litigation from Defendant Project Verte pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE**, Plaintiff prays:

a.  That the Court enter judgment against Defendant under Count I of this Complaint;

b.  That the Court award compensatory and actual damages as a result of Defendant's conduct under Count II of this Complaint;

c.  That the Court award compensatory and actual damages as a result of Defendant's conduct under Count III of this Complaint;

d.  That the Court award Plaintiff its reasonable attorneys' fees and expenses of litigation from Defendant pursuant to O.C.G.A. § 13-6-11 under Count IV of this Complaint; and

e.  That the Court award Plaintiff such other and further relief as is just and proper.

This 13th day of April, 2020.

_/s/ Joel D. Bush, II_

KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA  30309-4528
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
jbush@kilpatricktownsend.com

Joel D. Bush, II
Georgia Bar No. 098775

Counsel for Plaintiff